**In re PHILADELPHIA RAPID TRANSIT CO.**

District Court, E. D. Pennsylvania.

April 30, 1935.

See, also, (D. C.) 8 F. Supp. 51.

S. Davis Wilson, of Philadelphia, Pa., for petitioner.

Before DICKINSON, KIRKPATRICK, and WELSH, District Judges.

DICKINSON, District Judge.

We treat this petition as one for instructions to the special master. Ordinarily we would not feel called upon to grant it but leave the matters discussed to the able hands of the special master. There are, however, questions raised which have in them elements of novelty, the answers to which in advance may save time and discussion at a later stage. The final end of any proceeding under Bankruptcy Act § 77B (11 USCA § 207), may be bankruptcy as commonly understood. Before this stage is reached the end proposed in the petition is the approval or disapproval of a plan of adjustment of the indebtedness of the debtor. This calls for the action of the court, but such action is preceded by a number of things. One is the approving vote of the required majority of creditors. Before a vote can be had the creditors must be found and classified so as to determine who has the right to vote. This determination, however, is solely for the purposes of the election. It determines the right to vote upon the acceptance or rejection of the plan when submitted. Failure to qualify as a voter does not exclude any one from participating as a creditor in the distribution of the assets of the debtor. Such distribution may never be reached. If it is, it is reached at a later stage of the proceedings. This qualification of voters is a preliminary stage and is the stage

now reached. It is within the power of the court, as it is its duty, to find who are creditors and to classify them. This it may do through a special master. In the performance of this duty it may prescribe a form and method of proving claims. The practice followed in bankruptcy in voting upon an offer of composition may serve as an analogue and guide. Creditors who file formal proofs of their claims, to which no objections are interposed, may be admitted to vote as by unanimous consent. If such proofs of claim are objected to, the claims must be proven. Here again the Bankruptcy Law supplies a sufficient guide. The burden of proof and what is or is not the making out of a prima facie case is determined as in other cases. The court or special master may, however, apply the principles of the affidavit of defense law by not requiring formal proofs of what is not in dispute but take this as admitted. The primary purpose of the section 77B amendment should not be lost sight of. This is to reach an adjustment acceptable to creditors of the indebtedness of the debtor, or if there is an objecting minority, to make sure that the adjustment is fair to them so as to save them from being made the victims of a "freeze-out" scheme. To assure this there must be a fair election, and to secure this every creditor must be given the right to vote and no one admitted who is not a creditor. The creditors who have this right are, however, the creditors of the debtor. The act has thus two successive objectives. The first is this preliminary finding of who are the creditors of the debtor with this right to vote; the second is to determine whether the plan submitted should be approved. These two things are separate and distinct and may be determined on wholly different considerations. If the plan involves nothing but a debt reduction as, for illustration, the abatement of 25 per cent. of the indebtedness, it might affect only creditors. The plan might, however, concern the public policy of the law and directly concern others than creditors. The Atlas, who bears upon his shoulders the whole weight of the plan in the case of transportation companies, is the car rider. If his patronage can·be assured and the fare he pays made high enough, a plan highly satisfactory to creditors and stockholders could easily be devised. A plan may in consequence vitally concern him. Again, creditors might be placated by being given mortgage bond securities whose value was in excess of their just claims, thus doing an injustice to stockholders who would then become directly concerned. Still again, the plan might contemplate the issue of securities which are prohibited by the policy of the law declared in the Pennsylvania statute of 1913, P. L. 1374 (66 PS Pa. § 1 et seq.), or other "Sky Blue" laws. Once again, in this particular instance, the plan might impinge upon the rights of the city of Philadelphia as a partner of the P. R. T. It is thus seen that the second question of the approval of the plan might bear upon other interests than those of mere creditors. Indeed, because of this the plan under the provision of the law cannot have the approval of the court until after it has first had the approval of other official functionaries, as for instance, the Public Service Commission. Many considerations other than that of debt adjustment may thus enter into the final approval of the plan by the court. Notwithstanding this, the truth remains that the plan must have this preliminary approval or disapproval of creditors, and it is the special function of the court to have this action taken.

So much·for the general principles. The specific question raised is this: One class·of creditors is composed of what are known as "Underliers." They began as the owners, and in some instances the operators, of short route street railways. It is averred that by methods well known to "High Finance" successive combinations were made through which the value of their property and franchises was pyramided until it was finally unloaded upon this debtor at what was far in excess of any fair value it had. They thus became creditors with highly inflated claims. Without taking the trouble to verify figures, it may be said that their claims now reach the nominal sum of $87,000,000; it is anticipated that this indebtedness will be adjusted at $54,000,000, while it is averred that their just claims should not exceed $30,000,000. It is complained that if they are given a vote on the basis of $87,000,000, they will be given an undue weight in the adoption or rejection of any plan submitted.

To these proofs of claims there are in consequence objections made, and it is asked that the Underliers be required to produce their books and papers so that the fair consideration·for their present debt holdings may be determined. As the indebted-

ness must be classified, it is not altogether clear that the result anticipated will follow, but it must be admitted that every creditor has an interest in the claim of every other creditor so far as it affects the vote. It must not be forgotten, however, to what the present inquiry is limited. It may or may not be that a plan which gives to the Underlier creditors bonds secured by a mortgage for $54,000,000 or any other sum is not a plan which should have the approval of the court. That question will be met when it is reached. Obviously, it is now being prematurely raised. The question which now confronts us is the simple one of whether these Underliers are creditors of the "debtor," and for how much. To what extent their claims should be abated is a question not now before us. It may be that there are creditors of this debtor when as against others they could not show a claim. The question is the simple one of whether the P. R. T. has a defense to the claim as presented. If it has not, the creditors in question are its creditors and their claims should be allowed, solely let it be repeated, for the purpose of voting upon any plan which abates their claim.

The special master is instructed to allow or reject claims in accordance with this opinion. Beyond that the petition presented is dismissed and the prayers thereof denied.

WELSH, District Judge (dissenting).

I feel impelled to write this dissenting opinion because of the gravity and the consequences that I feel may follow the plan suggested by my esteemed colleagues. However, as the law conferring plenary power on this court to act is clear and unmistakable, an opinion of necessity partakes more of the nature of an argument than an "opinion" as ordinarily understood. This is not a mere matter of procedure, technical in its nature, but has far-reaching results on the equities of the parties involved. There is before us a proposed reorganization of a great metropolitan transportation system. This court has assumed jurisdiction. This court has also assumed the responsibilities and powers conferred upon it by the act. Those powers to enforce equitable principles are full, complete, and practically without limitation. Any ruling which would hold fast to the antiquated rules of the common law, or even technical rules of bankruptcy, would be inconsistent with the purposes of the act.

A brief outline of the question before us will help make this clear. This court appointed a special master for the following purposes, among other things: First, "upon proof and classification of claims and interests of creditors and stockholders"; second, "upon the plan of reorganization." This inquiry is necessary in order to know who shall vote on the proposed reorganization plan and with what potentiality. The Underliers have claimed to be creditors of Philadelphia Rapid Transit to an extent of $87,000,000. This claim has been seriously challenged by two groups of interested parties. These two groups claim that the actual amount of the Underliers claim is $30,000,000, rather than $87,000,000. It must be self-evident that it makes a vast difference whether the Underliers shall express their approval of a proposed plan with the voice of $87,000,000, or with the voice of $30,000,000. The challengers have asked the special master, first, to require the Underliers to prove their claim and show in detail these actual values or second, to permit them (the challengers) to have free access to the books, records, and documents of the Underliers and P. R. T., in order that they may show to the special master the good faith of their challenge. The special master has refused to do either and has said that he will permit the Underliers to have the voting strength of an $87,000,000 interested creditor and to vote accordingly. This court has been appealed to and the majority opinion upholds the master leaving the thought expressed that this whole problem is one between the P. R. T. (the debtor) and the Underliers, and with a further thought expressed that at the conclusion of the proceedings, after the plan has been approved by the master, approved by the city council, and approved by the Public Service Commission, when it comes back to this court for approval the challengers may renew their motion to have the good faith of the $87,000,000 claim of the Underliers inquired into. And it is just here that the case is such that it cannot be seriously contended that it is a matter of technical procedure. Let us view the question in a practical light and ask ourselves if postponement of an inquiry into the good faith of the claims of the Underliers until the final stage of the proceedings will not amount to an actual, substantial denial of right and make it impossible, should collusion exist, to prove it or thwart it.

This is the picture as it will unfold: The hearings will proceed before the special master as indicated by the majority opinion. The special master will approve the plan. The plan will then be taken up by city council for their *approval*, not for its amendment or alteration. The plan will then be taken before the Public Service Commission for its *approval*, not for its amendment or alteration. But in the face of the Public Service Commission Act of 1913, to which I refer at length later on, which prohibits the merging of public service companies on a basis exceeding the aggregate value of the property so consolidating or merging, etc., how could the Public Service Commission actually consider the plan when it was brought officially to their attention that said plan was in violation of that act. However, assuming that it passed the scrutiny of the Public Service Commission it would then come back to this court, after having dragged its way from one tribunal to another possibly through many weary months. Then, when every one concerned is either anxious for action or impatient of delay, the majority opinion holds that the proper time for the challengers to raise the question of fraud, collusion, and good faith has arrived. The psychological effect of this delay, with the impatience thus aroused, would be the excuse for a very strong appeal on the part of P. R. T. and the Underliers to refuse the request. And even should the request be granted at that late day, it would be almost an impossible task to show sufficient fraud, collusion, and bad faith as to warrant the court in refusing to approve the plan which had up to this time cleared every hurdle and overcome every obstruction in its path.

The above reasons are made more impelling to me when I reflect that in September last, the majority opinion of this court held that the history of P. R. T. "is a history of the exploitation of great and valuable public franchises by selfish financial interests. * * * That control [of P. R. T.] has been attended all the way by the most ruthless exploitation of stockholders, the city, and the traveling public alike. * * *" 8 F. Supp. 51, 52.

The writer of this dissenting opinion agreed with the above expression, and it makes him feel all the more obliged to see that in the future there shall be no recurrence of what has happened in the past. He does not for an instant say that he has at this moment any knowledge of any collusion, wrongdoing, or lack of good faith; but in view of what has happened in the past, and in consideration of what two reputable groups contend does exist in the present, he feels that those questions should be inquired into at the outset so that the rights and equities may be established on a basis fair to all. So much for the practical side of the question.

We now turn to the law which is involved.

1. The purpose of section 77B, Bankr. Act (11 USCA § 207), is to *conserve* the assets, to bring about a new set up of the various claims of the creditors, stockholders, and other parties in interest, and to establish a reorganization for a continued management.

2. The purpose of the original Bankruptcy Act (11 USCA § 1 et seq.) is to *liquidate*, reduce assets to cash, and to make distribution of the bankrupt's estate to creditors and other parties in interest.

3. Section 77B specifically provides that the court shall have all the powers which federal courts have in cases of receiverships in equity. In the interpretation and application of section 77B, therefore, the general principles of equity jurisprudence must be applied.

4. In technical bankruptcy cases, section 57, Bankr. Act (11 USCA § 93), outlines the method of proving claims. Section 77B has its own provision in reference to the proof of claims and provides that the court shall fix the time for the filing of claims and the "manner" in which such claims may be filed or "evidenced" and allowed, and the only reference to section 57 is in connection with the proof of secured claims. In other words, the proof and allowance of claims is entirely within the control of the court in reorganization cases, and governed by equitable principles so that all interests may be properly protected.

5. Whether the claims be filed in the manner directed by the court under section 77B, or whether they be filed or considered in accordance with the requirements of section 57, objections may be made to the claims as filed, and the proofs of claims and objections thereto may be heard as the court may determine; even of its own motion.

6. Parties in interest vote on a proposed reorganization plan on the basis of the amounts of their claims. It is therefore essential that the amounts which form the

voting basis should be determined before the plan is submitted. This will require due proof and the disposition of objections made to the claims as filed.

7. Section 77A, Bankr. Act (11 USCA § 206), in *addition* to the jurisdiction in proceedings to adjudge persons bankrupt, directs that courts of bankruptcy "shall exercise original jurisdiction in proceedings for the relief of debtors, as provided in section 77B [section 207 of this chapter]."

Section 77B, is entitled "Corporate reorganizations," and provides that any corporation "which could become a bankrupt," as provided by the Bankruptcy Act, may filed a petition setting forth certain facts; showing the need for relief and that "it desires to effect a plan for reorganization."

It is the duty of the judge to enter an order approving the petition as properly filed if it complies with the act and filed in good faith.

If so approved, an order of adjudication in *bankruptcy shall not be entered,* and the court shall have exclusive jurisdiction of the debtor and its property during the pendency of the proceedings and "shall have and may exercise all the powers * * * which a Federal court would have had it appointed a receiver in equity of the property of the debtor by reason of its inability to pay its debts as they mature."

Section 77B is a reorganization section to conserve assets. The other provisions of the Bankruptcy Act are provisions to liquidate and distribute. The former require the application of broad equitable principles. The latter rests in the application of technical principles of law.

8. The quotation from the act, section 77B, cl. (c), Bankr. Act, 11 USCA § 207 (c), indicates that the Congress intended that the judges of the District Court should not be bound by any analogies or precedents in matters of procedure, but that they were given full and complete powers to meet any situation that might arise. It provides that when the petition has been approved, the judge "shall determine a reasonable time within which the claims * * * of creditors and stockholders may be *filed or evidenced* and * * * the manner in which such claims and interests may be *filed or evidenced and allowed,* and * * * the division of creditors * * * into classes according to the nature of their respective claims and interests." The amount of *secured* claim shall be determined as provided by section 57, cl. (h), Bankr. Act, 11 USCA § 93 (h).

9. The act all the way through recognizes the amount of the claims and the necessity for their being allowed. Section 77B (e), Bankr. Act (11 USCA § 207 (e), provides that the plan of reorganization "shall not be *confirmed* until it has been accepted in writing * * * by or on behalf of creditors holding two thirds *in amount* of the claims of each class whose claims have been allowed."

The majority opinion and the dissenting opinion hold divergent views with reference to the public, employees, and any other group other than the strictly debtor creditor group, but the reading of the act shows that the Congress had in mind the special circumstances of a public utility corporation.

10. Section 77B (e) (2) of the act, 11 USCA § 207 (e) (2), provides: "In case the debtor is a utility subject to the jurisdiction of a regulatory commission or commissions or other regulatory authority or authorities, created by the laws of the State or States in which the properties of the debtor are operated, a plan of reorganization shall not be confirmed until (a) it shall be submitted to each such commission or authority having regulatory jurisdiction over the debtor, (b) an opportunity shall be afforded each such commission or authority to suggest amendments or objections to the plan, and (c) the judge shall consider such amendments or objections at a hearing at which each such commission or authority may be heard." I need not quote at length article 3, § 6 (a), of the Public Service Companies Law, July 26, 1913, P. L. 1374 (66 PS Pa. § 241), in which the Legislature prohibits any public service company from capitalizing a lease or a contract for consolidation or merger of two or more public service companies or to issue, by way of substitution, any capital stock, trust certificates, bonds, notes, or other evidences of indebtedness or other securities, for any consolidated or merged company *exceeding the aggregate values* of the properties of the companies so consolidating or merging and any additional sum actually paid in, in cash, and any additional property or labor actually contributed.

It will be seen from the above provisions of the law they are surrounded by

870

more than the usual protective provisions, and I feel that this court should take due notice of that fact.

I, therefore, dissent from the majority opinion of this court because I feel that the special master should be instructed to proceed with the case, to require the production before him of all necessary books, documents, papers, and witnesses so that at the request of challenging groups all possible testimony and evidence which could throw light on this important case could be produced. If it be urged that to permit the challengers to follow the course that they request would cause a delay in the proceedings, it may be well to bear in mind that the very same question of delay would present itself were the challengers to renew their request at the final stage of the proceedings before this court.

The above principles apply not only to the case at issue. They are important and relevant to every other case, great or small, that might come under the jurisdiction of this court by virtue of this salutary statute (section 77B). The act was intended to provide for an equitable readjustment of our great financial institutions. In order to prevent fraud in such reorganizations, great powers were given to this court and I feel that we ought to use them. If this court should hold itself powerless to earnestly inquire into charges of fraud and corruption made in good faith at the inception of a proceeding, honest minority creditors will find themselves at the mercy of certain powerful groups in control of the debtor and certain powerful creditors working in collusion. It is for these reasons I feel moved to file this dissenting opinion even though I may be in such strong opposition to my esteemed colleagues of this court on this really major matter of recently conferred jurisdiction.